**SIGNED THIS: October 24, 2012**

_____
**Mary P. Gorman
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re ) | |
| ) | Case No. 09-70602 |
| WILDWOOD INDUSTRIES, INC., ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | |
| ) | |
| ALEX D. MOGLIA, ) | |
|  Chapter 7 Trustee, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 11-7023 |
| ) | |
| BLOCKSOM & COMPANY, ) | |
| ) | |
| Defendant. ) | |

**O P I N I O N**

Plaintiff, Alex D. Moglia, Chapter 7 Trustee, sued Defendant, Blocksom & Company, to

-1-

recover over $30,000 in alleged preferential transfers made to the Defendant by the Debtor, Wildwood Industries, Inc. The Defendant admits receiving the funds from the Debtor but claims that the transfers are not avoidable by the Trustee because they were made in the ordinary course of business and because new value was provided to the Debtor by the Defendant after each transfer. After trial of the issues, this Court finds that although the Defendant established its new value defense as to some of the transfers, judgment should be entered in favor of the Trustee and against the Defendant in the amount of $12,247.20 plus prejudgment interest and costs.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Wildwood Industries, Inc. ("Wildwood") was the subject of an involuntary Chapter 11 petition filed by several of its creditors on March 5, 2009. An order for relief was entered on March 27, 2009. Alex D. Moglia ("Trustee") was appointed Chapter 11 Trustee on April 8, 2009, and was reappointed as Chapter 7 Trustee after the case was converted on September 18, 2009.

After investigating Wildwood's affairs, the Trustee filed his complaint against Blocksom & Company ("Blocksom") on February 11, 2011. In the complaint, the Trustee alleges that Wildwood made transfers to Blocksom during the ninety days before Wildwood's bankruptcy in the aggregate amount of $30,618 which are avoidable as preferential. Blocksom filed an answer in which it admitted receiving the payments from Wildwood but denied that the payments are avoidable. Blocksom raises two affirmative defenses, claiming that the transfers were made in the ordinary course of business and that Blocksom provided new value to Wildwood after each payment.

Trial of the complaint was held on August 29, 2012. At trial, Mark Baum, a consultant at Moglia Advisors, testified on behalf of the Trustee. Andrew Swan, president of Blocksom, testified on behalf of Blocksom.

Mr. Baum has an accounting background and worked extensively with the Trustee on the

Wildwood case and the matters giving rise to this adversary proceeding. Mr. Baum testified that Wildwood had its principal place of business in Bloomington, Illinois, and was in the business of manufacturing a variety of items, including vacuum cleaner bags, lawn waste bags, and air filters. After Mr. Moglia was appointed Chapter 11 Trustee, Mr. Baum was part of a team from Moglia Advisors which attempted to obtain financing to keep Wildwood operating so it could be sold as a going concern. The efforts were unsuccessful, and Wildwood's operations were shut down.

After Wildwood's business activities came to an end, the Trustee sold all of Wildwood's physical assets for $3.6 million. Mr. Baum testified about receivables and other assets the Trustee has recovered or continues to pursue. He also testified as to the amount of claims which have been filed and allowed in the case, including a significant amount of priority tax and wage claims. Mr. Baum estimated that when all assets are collected, general unsecured creditors will receive, at most, a dividend of about three-quarters of a cent on the dollar.

Mr. Baum also testified that at the time the involuntary petition was filed, the Trustee discovered that a significant amount of equipment that Wildwood had claimed over the years to have purchased with proceeds from loan and lease agreements had not, in fact, ever been purchased. The Trustee found and seized a box of serial number plates containing 75 to 100 plates which Wildwood employees shifted around on various pieces of equipment to mislead lenders or leaseholders attempting to identify and inspect their collateral. Mr. Baum estimated that no more than 5% of the equipment Wildwood claimed to have purchased was in existence at the Wildwood facilities.

Mr. Baum testified that according to Wildwood's records, during the ninety days preceding Wildwood's bankruptcy, Wildwood made two payments by check to Blocksom. Wildwood gave Blocksom the first check in the amount of $6123.60 on December 15, 2008, and that check cleared the next day. Blocksom applied the funds as a half payment on invoice No. 36081, which had been issued on October 22, 2008, and had an original balance of $12,247.20. Wildwood gave Blocksom

the second check on February 11, 2009, in the amount of $24,494.40, which also was honored the next day. Blocksom applied those funds to the remaining balance of $6123.60 on invoice No. 36081; the entire balance of $12,247.20 on invoice No. 36152, which had been issued on October 28, 2008; and as a half payment of $6123.60 on invoice No. 36320, which had a beginning balance of $12,247.20 and had been issued on November 11, 2008.

According to Mr. Swan, Blocksom is in the business of manufacturing a variety of non-woven textiles and sold a variety of its products to Wildwood. Wildwood's business relationship with Blocksom began in 2005. Initially, Wildwood had to pay according to a "net 60" arrangement, with Wildwood required to pay each invoice from Blocksom within sixty days after issuance. The "net 60" arrangement is a standard payment term Blocksom imposes on all of its customers and is a payment term which, according to Mr. Swan, is standard in its industry.

Over a period of time, Wildwood's relationship with Blocksom developed into a revolving credit arrangement. Wildwood had to maintain its outstanding balance with Blocksom at or below a set credit limit and Blocksom routinely refused to ship products to Wildwood until Wildwood's account was sufficiently paid down so that the invoice for a new shipment did not cause the credit limit to be exceeded. Swan testified that Wildwood occasionally bundled payments on multiple invoices in a single check in order to get below its credit limit so that Blocksom would ship more products to Wildwood. Wildwood's credit limit started at $5000 but quickly increased to $25,000. As time passed, Blocksom came to believe that Wildwood was a promising firm with good growth prospects, and therefore increased the credit limit to $40,000, and then again to $55,000 during the preference period.

Wildwood typically paid Blocksom by check and Blocksom routinely applied payments to the oldest outstanding invoices. Before the preference period, the number of days from the date of the invoice until Wildwood's *full* payment of an invoice varied widely, from 20 days to as many as

110 days. Twenty-one pre-preference-period invoices were introduced into evidence. During the preference period, the number of days from the date of the invoice until at least *partial* payment ranged from 54 days to 112 days; ultimately, the two invoices paid in full during the preference period were paid 112 and 106 days after the date of invoice. Mr. Swan opined that this variance was normal because seasonal sales volume fluctuations are common in the air filter industry.

Wildwood payments to Blocksom typically were in the range of $12,000, which Swan testified constituted the amount due for a full truckload of products. But the first preference period payment was only a partial payment on invoice No. 36081. Prior to the preference period, Wildwood had never made only a partial payment on an invoice.

At no point during Wildwood's business relationship with Blocksom did Blocksom tighten the terms of the relationship, such as by requiring a different method or timing of payment.[1] In fact, during the preference period, Blocksom increased Wildwood's credit limit to $55,000, from $40,000. Also, the day after Blocksom received the two preference period payments, Blocksom provided full truckloads of goods to Wildwood. The invoices for those goods remain unpaid. And, although Wildwood only requested a half load of goods at the time of the December payment, Swan sent a full truckload of goods as a "goodwill gesture" because the cost of shipping a full load would be the same as shipping only a half load. Swan shipped the extra goods even though Wildwood had said to Blocksom that its cash flow was tight due to cyclical sales variations. Blocksom was not aware of Wildwood's deteriorating financial condition until Wildwood ended up in bankruptcy.

---

[1] The Trustee presented a purchase order dated October 21, 2008, from Wildwood to Blocksom which contained a handwritten notation of "N30Terms," which the Trustee suggested meant that the payment terms were reduced from net 60 to net 30. However, the Court finds that Swan credibly responded that this notation was not made at his direction and that there was, in fact, no change from the net 60 payment term.

## II. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. A proceeding to determine, avoid, or recover a preference is a core proceeding. *See* 28 U.S.C. §157(b)(2)(F).

## III. LEGAL ANALYSIS

*A. Wildwood made two preferential transfers to Blocksom*

Section 547 of the Bankruptcy Code allows a trustee to avoid certain preferential transfers made by a debtor prior to bankruptcy. *See* 11 U.S.C. §547(b). The provision helps the trustee to augment the estate, ensure that similarly-situated creditors are treated alike, and reduce the incentive individual creditors have to pursue actions that might destabilize a weakened debtor. *See Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 564 (7th Cir. 2001).

To establish that a transfer of the debtor's property is preferential, a trustee has the burden of showing (1) that the transfer was to or for the benefit of a creditor, (2) was for or on account of an antecedent debt, (3) was made while the debtor was insolvent, (4) was made within ninety days before the petition was filed, and (5) allowed the creditor to receive more than it would have received if the debtor were in Chapter 7 and the transfer had not been made. *See* 11 U.S.C. §547(b).

The Trustee proved each element necessary to establish his claim that preferential transfers were made by Wildwood to Blocksom. It is undisputed that, during the preference period, Wildwood delivered two checks to Blocksom, one for $6123.60 and another for $24,494.40. The two checks were honored by Wildwood's bank and the proceeds were applied to unpaid invoices for products Blocksom had previously delivered to Wildwood. Hence, the payments were on account of antecedent debts. Given Mr. Baum's undisputed testimony about the significant amount of missing or non-existent Wildwood assets, the millions in claims filed by Wildwood creditors, and the fact that general unsecured creditors will receive a dividend of only about three-quarters of a cent on the

dollar, the Trustee established that Wildwood was insolvent during the ninety days immediately preceding the filing of the involuntary petition. And, there is no real dispute that, had Blocksom not received the two checks totaling $30,618, it would have had a general unsecured claim for that amount which would now be expected to be paid at less than a penny on the dollar. Accordingly, Blocksom received more that it would have if the transfers had not been made.

Blocksom never really disputed the essential facts of the Trustee's claim. The Trustee has met his burden of proof in establishing that Blocksom received $30,618 in preferential payments from Wildwood.

### B. The preferential transfers are partially exempt from avoidance

Blocksom argues that even if the payments it received were preferential, they are exempt from avoidance by the Trustee because they were made in the ordinary course of business and Blocksom provided Wildwood with new value after each payment. *See* 11 U.S.C. §547(c)(2), (4). Blocksom has the burden of proof on its affirmative defenses. *See* 11 U.S.C. §547(g).

#### 1. Section 547(c)(4) - New Value

Blocksom claims that it provided Wildwood with $18,370.80 of products which constitute "new value" and can be used to offset the Trustee's claims. Blocksom relies on §547(c)(4), which provides that a preferential transfer may not be avoided if the transfer was:

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. §547(c)(4).

"New value" includes "money or money's worth in goods, services, or new credit…but does not include an obligation substituted for an existing obligation[.]" 11 U.S.C. §547(a)(3). The idea of "new value" is a codification of the concept of consideration from contract law. *Gouveia v. RDI Grp.* (*In re Globe Bldg. Materials*), 484 F.3d 946, 949 (7th Cir. 2007). The theory behind allowing new value to serve as a defense to the avoidance and recovery of preferential payments is that just as the preferential payments deplete an estate, new value replenishes an estate. Where new value is supplied after payments are received, only the actual net diminution of the estate should remain recoverable.

If a creditor proves that it gave new value, then it may offset the payments it received against the amount of new value it subsequently gave the debtor. *U.S. Bank Nat'l Ass'n v. Plains Marketing Can. LP* (*In re Renew Energy LLC*), 463 B.R. 475, 483 (Bankr. W.D. Wis. 2011). New value is measured at the time the debtor takes possession of the transferred goods. *Id.* The new value also must remain unpaid. *See P.A. Bergner & Co. v. Bank One, Milwaukee, N.A.* (*In re P.A. Bergner & Co.*), 140 F.3d 1111, 1121 (7th Cir. 1998).

Wildwood gave Blocksom the first check at issue here on December 15, 2008, in the amount of $6123.60. The next day, Blocksom provided Wildwood with $12,247.20 of goods. The new value Blocksom delivered to Wildwood on December 16th exceeded the amount of the December 15th preferential payment. The Trustee argued at trial that Blocksom did not satisfy its burden of showing that Blocksom provided new value because Blocksom only established that the Wildwood check was honored sometime on the same day the new value was given. According to the Trustee, this is insufficient to show that Blocksom gave new value subsequent to receipt of the preferential payment. But, the Trustee's legal argument is incorrect. For purposes of establishing new value, the date of

the delivery of the check to the creditor is what matters, not the date when the check clears. *See, e.g.*, *Barnhill v. Johnson*, 503 U.S. 393, 402 n.9 (1992) (noting the prevailing view among Courts of Appeals); *Brown v. Shell Can. Ltd.* (*In re Tenn. Chem. Co.*), 112 F.3d 234, 238 (6th Cir. 1997); *Rushton v. E & S Int'l Enters., Inc.* (*In re Eleva, Inc.*), 235 B.R. 486, 488-89 (B.A.P. 10th Cir. 1999); *Brandt v. Sprint Corp.* (*In re Sonicraft, Inc.*), 238 B.R. 409, 415 (Bankr. N.D. Ill. 1999). By contrast, the date of honor rule applies to the initial proof required to establish that a preferential payment was made in the first place. *See Barnhill*, 503 U.S. at 402 (contrasting the rule for §§547(b) and (c)). There is no dispute that Blocksom received the check on December 15th, the goods shipped on December 16th, and the new value reflected in the December 16th shipment remains unpaid. Accordingly, the full amount of the December payment, $6123.60, is exempt from avoidance.

Wildwood gave Blocksom the second check at issue here on February 11, 2009, in the amount of $24,494.40. The next day, Blocksom delivered $12,247.20 worth of goods to Wildwood. The check delivery date controls once again, and so the $12,247.20 in goods Blocksom delivered on February 12th were shipped after receipt of the preferential payment and, therefore, constituted new value. Because the invoice for the February 12th shipment remains unpaid, the new value offsets the preference payment by $12,247.20.

Blocksom met its burden of proof that $18,370.80 ($6123.60 plus $12,247.20) of the preferential transfers it received from Wildwood are exempt from avoidance because new value was provided by Blocksom after the payments were received.

### 2. Section 547(c)(2) - Ordinary Course of Business

Blocksom argued vigorously that the preferential payments it received were made in the

-9-

ordinary course of business and, therefore, exempt from avoidance. Because $18,370.80 of the preferences have already been found exempt as new value, the question is whether the remaining $12,247.20 Blocksom received on February 11th is exempt under the ordinary course of business exception to avoidance.

Blocksom relies on §547(c)(2), which provides that a trustee may not avoid a preferential transfer:

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was –
>
> > (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> >
> > (B) made according to ordinary business terms[.]

11 U.S.C. §547(c)(2).

Generally, the ordinary course of business analysis focuses on whether the preferential payment was made in the ordinary course of business. But, the statute requires a threshold analysis of whether the debt paid by the preferential payment was also incurred in the ordinary course of business of both the debtor and the creditor. If the debt originated outside of the ordinary course of business, such as through an insider transaction, then the defense of ordinary course will not be available regardless of the payment circumstances. *See Huffman v. N.J. Steel Corp.* (*In re Valley Steel Corp.*), 182 B.R. 728, 735 (Bankr. W.D. Va. 1995); *Youthland, Inc. v. Sunshine Girls of Fla., Inc.* (*In re Youthland, Inc.*), 160 B.R. 311, 314 (Bankr. S.D. Ohio 1993).

As to this threshold issue, the Trustee did not dispute that the debts the preference payments satisfied were incurred in the ordinary course of Wildwood's and Blocksom's respective businesses. Blocksom began supplying Wildwood with products in 2005. The invoices to which the December

-10-

and February preference payments were applied were in furtherance of a business relationship that Wildwood and Blocksom had developed over the preceding three years. Mr. Swan testified that all of its sales to Wildwood were arms-length transactions, and no evidence suggests otherwise. Blocksom easily satisfied its burden of showing that the debts to which Blocksom applied the preference payments were incurred in the ordinary course of business of both Blocksom and Wildwood.

The more difficult task for Blocksom was establishing that the preferential payments were made in the ordinary course of business of both Wildwood and Blocksom or that the payments were made according to ordinary business terms. Blocksom was required to prove the elements of either subparagraph (A) or (B) of §547(c)(2) in order to prevail. *See* 11 U.S.C. §547(c)(2)(A), (B). Unfortunately for Blocksom, it was not able to meet its burden on either issue.[2]

Subparagraph (A), sometimes known as the "subjective test," requires a creditor to establish a history of dealings between itself and the debtor which enables the court to compare the payment practices during the preference period with the parties' prior course of dealing. *Barber v. Cent. Bank Ill., N.A.* (*In re Trappers Creek, LLC*), 2010 WL 797022, at *4 (Bankr. C.D. Ill. Mar. 5, 2010). In essence, subparagraph (A) requires the creditor to prove that the transfer was consistent with the parties' practices before the preference period began. *Id.* To make this determination, courts consider a number of factors including, but not limited to:

---

[2] Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), in order to prevail on a preference avoidance action based upon the "ordinary course of business" exception, a transferee was required to prove both that the transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee *and* that the transfer was made according to ordinary business terms. *See* 11 U.S.C. §547(c)(2)(amended 2005).With the enactment of BAPCPA, the statutory language of §547(c)(2) was changed to require the transferee to prove only one of the elements in order to prevail.

(1) the length of time the parties engaged in the type of transaction at issue;

(2) whether the amount or form of the transfer differed from earlier practices;

(3) whether the debtor or creditor engaged in any unusual collection or payment activity; and

(4) whether the creditor took advantage of the debtor's financial condition.

*Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003).

At trial, Mr. Swan testified that Wildwood began ordering products from Blocksom in 2005 and did so up to and during the preference period. Initially, Wildwood's credit limit was $5000, which was increased at some point to $25,000, and then later to $40,000. During the preference period, the limit was increased to $55,000. Throughout their relationship, the terms of their credit agreement required Wildwood to pay Blocksom for goods within 60 days of invoice. But before the preference period, Wildwood actually paid anywhere from 20 to 110 days after invoice. During the preference period, Wildwood paid Blocksom between 54 and 112 days after invoice. Mr. Swan testified that Blocksom was not aware of Wildwood's actual financial condition before or during the preference period.

A course of late payments can become the ordinary course of payments. *See In re Xonics Imaging Inc.,* 837 F.2d 763, 766-67 (7th Cir. 1988). Ordinary course may be defined by not only what parties are contractually obligated to do but also by what they actually do. *Id*. But, to establish that the ordinary course of a business relationship is something other than what the parties have contractually obligated themselves to do, a creditor must show a pattern of conduct or practice that actually has become their ordinary course. Here, Blocksom failed to establish a pattern or practice of payments that had developed with Wildwood over the years and continued through the preference period.

None of the three invoices paid during the preference period were paid *in full* in fewer than 106 days after the date of the invoice. By contrast, of the 21 invoices with pre-preference-period due dates, all of which were paid in full at a single time, Wildwood paid only one of them at least 106 days after the date of the invoice — invoice No. 33449 was paid 110 days after the invoice date. Furthermore, of the three invoices to which the preferences were applied, only two were paid in full: invoice Nos. 36081 and 36152. Full payment on invoice No. 36081 ultimately occurred 112 days after the invoice date, and for invoice No. 36152, full payment was made 106 days after the invoice date. The average of the two is 109 days. Full payment on the 21 invoices paid in full during the pre-preference period occurred, on average, about 65 days after the date of invoice. This substantial difference in when full payment on an invoice occurred compels a finding that the preferential transfers were outside Wildwood's and Blocksom's ordinary course of business.

Additionally, the failure to pay an invoice in full at one time was itself a new development during the preference period. The December preference was applied as a half payment on invoice No. 36081. The remaining balance on invoice No. 36081 was paid from the February preference. In Blocksom's and Wildwood's business relationship, every previous invoice was paid in full at a single time, and the half-payment of invoice No. 36081 constituted the first change from this practice. Similarly, the February preference provided only a half payment on invoice No. 36320. In short, two of the three separate invoices paid during the preference period were paid, at first, only in part. This represented a substantial deviation from past practice and, again, compels a finding that the payments were outside the ordinary course. *See Cellmark Paper, Inc. v. Ames Merch. Corp.* (*In re Ames Dep't Stores, Inc.*), 470 B.R. 280, 286 (S.D.N.Y. 2012); *Flatau v. Curington, LLC* (*In re Nobles*), 2010 WL 3260128, at *6 (Bankr. M.D. Ga. Aug. 18, 2010); *Radnor Holdings Corp. v. PPT*

*Consulting, LLC* (*In re Radnor Holdings Corp.*), 2009 WL 2004226, at *6 (Bankr. D. Del. July 9, 2009).

By agreement, Blocksom and the Trustee entered into evidence volumes of documents including all of the invoices from every purchase made by Wildwood from Blocksom during their entire relationship. A review of the documents discloses no obvious pattern of payment. Despite all of its evidence, Blocksom never established an "ordinary course of business" to which the preference period payments could be compared. This lack of consistency makes it difficult to establish that the transfers were made in the ordinary course of business. Accordingly, to find that the preferences in this case were part of the ordinary course of business would undermine the proposition that the ordinary course of business defense is designed primarily for recurring, consistent credit transactions, rather than unexplained and facially unusual, irregular, or anomalous activity. *See Kleven*, 334 F.3d at 642; *Writing Sales Ltd. Partnership v. Cardinal Prods.* (*In re Writing Sales Ltd. Partnership*), 96 B.R. 179, 181 (Bankr. E.D. Wis. 1989).

Blocksom failed to meet its burden of proof that the preferential payments were made in the ordinary course of business as required by subparagraph (A) to be exempt from avoidance. 11 U.S.C. §547(c)(2)(A).

The "ordinary business terms" verbiage of subparagraph (B) is known as the "objective test," and requires that to be exempt from avoidance, the transfer must have been made within "the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor engage…[.]" *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) (emphasis in original). To satisfy this part of the ordinary course of business defense, a creditor must establish that its dealings with the debtor fall within the range of limits established by standard industry practice.

Case 11-07023 Doc 48 Filed 10/24/12 Entered 10/24/12 09:42:16 Desc Main
Document - Memorandum/Opinion Page 15 of 17

*In re Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir. 1995); *Paloian v. Quad-Tech, Inc.* (*In re GGSI Liquidation, Inc.*), 313 B.R. 770, 775 (Bankr. N.D. Ill. 2004).

In this case, Blocksom presented virtually no evidence of typical industry practice. The only potentially relevant evidence was Mr. Swan's testimony that Blocksom usually imposes "net 60" payment terms on its buyers and that such terms are standard in the industry. Mr. Swan also stated that Blocksom commonly is paid late because its customers sometimes experience cash flow problems as their sales volumes fluctuate and that such fluctuation is industry-wide. This is insufficient to establish that the preferential payments here were made within the range of terms common to the industry. Blocksom presented no documentation or specific testimony about its transactions with other businesses in the industry or even the identity of other businesses in the industry. No other evidence illuminated industry practice. *See H.L. Hansen Lumber Co. of Galesburg, Inc. v. G & H Custom Craft, Inc.* (*In re H.L. Hansen Lumber Co. of Galesburg, Inc.*), 270 B.R. 273, 280-81 (Bankr. C.D. Ill. 2001) (creditor failed to define relevant industry or identify other firms in the industry).

Blocksom failed to meet its burden of proof that the preferential payments were made according to ordinary business terms as required by subparagraph (B) to be exempt from avoidance. 11 U.S.C. §547(c)(2)(B).

Because Blocksom failed to prove its ordinary course of business defense, the Trustee is entitled to judgment for $12,247.20 in preferential payments received by Blocksom from Wildwood.

*C. The trustee is entitled to prejudgment interest and costs.*

In his complaint, the Trustee requested prejudgment interest and his costs of suit. Awarding

pre-judgment interest is appropriate because, as the Seventh Circuit has said, it is "an ingredient of full compensation." *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A.* (*In re P.A. Bergner & Co.*), 140 F.3d 1111, 1123 (7th Cir. 1998). "Compensation deferred is compensation reduced by the time value of money" and, accordingly, the award of prejudgment interest is appropriate. *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997).

Federal courts may exercise sound discretion in setting a prejudgment interest rate. *See Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). In large measure, the prejudgment interest rate is a matter of fairness and balancing of the equities *Id.* Generally, pre-judgment interest is awarded at the statutory post-judgment rate. *See Krol v. Wilcek ( In re H. King & Assocs.),* 295 B.R. 246, 257 (Bankr. N.D. Ill 2003); 28 U.S.C. §1961.

The Court will award the Trustee prejudgment interest at the statutory post-judgment interest rate of 0.18%, which is the average one-year constant maturity Treasury yield for the week ending October 19, 2012. *See* 28 U.S.C. §1961(a); *Barber v. Lebo* (*In re Indus. & Mun. Eng'g, Inc.*), 127 B.R. 848, 851 (Bankr. C.D. Ill. 1990) (using the post-judgment rate for prejudgment interest in a preference action). Interest generally accrues from the earlier of the date the trustee demands the money from the recipient of the transfer or the date the adversary proceeding is filed. *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 294 (Bankr. N.D. Ill. 2008). There is no evidence that the Trustee demanded the return of the transfers before filing this preference action, so the interest will run from the date this adversary case was filed, which was February 11, 2011.

On a principal sum of $12,247.20 and at a rate of 0.18% for 621 days, the Court finds that the Trustee is entitled to $37.47 of prejudgment interest.

The Trustee is also entitled to his costs, which generally should be allowed to a prevailing

party. *See* Fed. R. Bankr. P. 7054(b). The Trustee presented no evidence of any costs other than the filing fee, which is a matter of record. Costs in the amount of $250 representing the filing fee will be awarded.

## IV. CONCLUSION

The Court finds that the Trustee is entitled to judgment in his favor and against Blocksom in the amount of $12,247.20, plus prejudgment interest of $37.47 and costs of $250.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

See written Order.

###